**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BERISH BERGER,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **ELI WEINSTEIN, RAVINDER** | : | |
| **CHAWLA, 2040 MARKET** | : | |
| **ASSOCIATES, LP, JFK BLVD** | : | |
| **ACQUISITION PARTNERS, LP, UBS** | : | |
| **REAL ESTATE SECURITIES, INC.,** | : | |
| **MARK SAHAYA, PINE PROJECTS,** | : | |
| **LLC, MONTGOMERY ABSTRACT,** | : | |
| **WORLD ACQUISITION PARTNERS** | : | |
| **CORP.,** | : | **No. 07-994** |
| **Defendants.** | : | |

<u>**MEMORANDUM & ORDER**</u>

**Schiller, J.**                                                                 **January 23, 2008**

This action arises from an unmemorialized investment relationship gone awry. In his Amended Complaint, Plaintiff Berish Berger alleges that he invested $36.5 million with Defendant Eli Weinstein to fund the purchase of two properties located in Philadelphia. Defendant Weinstein, however did not invest the money as promised. As a result, Plaintiff commenced this action seeking both legal and equitable relief.

On October 1, 2007, following three days of evidentiary hearings, the Court issued a preliminary injunction which: (1) enjoined the sale of 900 Delaware Avenue in Philadelphia, Pennsylvania and 101 West Avenue in Jenkintown, Pennsylvania; (2) required court approval prior to the sale of 2040 Market Street and certain properties located on John F. Kennedy Boulevard, both in Philadelphia, Pennsylvania; and (3) required Defendant Weinstein to submit a list of his assets and liabilities to all of the parties. The Court also allowed Plaintiff additional discovery time for the

purpose of determining whether the preliminary injunction should be broadened.

Presently before the Court is Plaintiff's motion to expand the scope of the preliminary injunction to include all of Defendant Weinstein's real estate assets and to appoint a temporary receiver to control all of Defendant Weinstein's non-real estate assets.  For the reasons discussed below, that motion will be granted in part and denied in part.  Accordingly, the Court's Preliminary Injunction Order will become final.  This memorandum is further intended to explain that finalized Order.

I.      **FINDINGS OF FACT**[1]

Plaintiff is an established British real estate investor.  (Sept. 10, 2007 Tr. at 55.)  In November 2006, through various social and business acquaintances, Plaintiff was introduced to Defendant Eli Weinstein, a Philadelphia real estate investor.  (*Id.* at 214; September 11, 2007 Tr. at 31-33.)  Weinstein told Berger that he was involved in some potentially lucrative investments in Philadelphia and invited Berger to look into Weinstein's projects on his next visit to the United States.  (Sept. 10, 2007 Tr. at 215; Sept. 11, 2007 Tr. at 133.)

A.      **The Investment Agreement**

In December 2006, Berger traveled to Philadelphia on business.  During that trip he met with Weinstein to discuss two separate real estate projects.  (Sept. 11, 2007 Tr. at 126, 146.)  The first was 2040 Market Street, a four story commercial building in Philadelphia.  (*Id.*)  The second was 8.5

---

[1] The Court makes the following findings of facts, pursuant to Federal Rule of Civil Procedure 52, based on the testimony and exhibits submitted into evidence at hearings held on September 10, September 11, and October 1, 2007, as well as the exhibits entered into evidence pursuant to this Court's December 4, 2007 Order.

acres of undeveloped land located on John F. Kennedy Boulevard ("the JFK Properties") with an appraised market value of $77 million.[2] (*Id.*; Ex. W-12 (Cushman & Wakefield Appraisal) at B0002.) The JFK properties were going to be developed into "[a] mix-use retail, entertainment, office, hotel and residential complex with on-site multi-level parking under a governmentally approved master plan." (Ex. W-12 at B0005; Sept. 11, 2007 Tr. at 10-12.) Also present at the December meeting were the architects involved in the JFK project, as well as Defendant Ravinder Chawla, another Philadelphia real estate investor who Plaintiff believed was an associate of Defendant Weinstein. (September 11, 2007 Tr. at 47, 56.)

Subsequent to the December meeting, Weinstein called Berger to discuss the two investments. (*Id.* at 142.) Weinstein proposed that the two enter into a partnership, whereby Berger would contribute $9.5 million toward the 2040 Market Street closing and $12 million toward the closing on the JFK properties. (Sept. 10, 2007 Tr. at 146.) This represented eighty percent of the funds required for the two closings; Weinstein would contribute the additional twenty percent. (*Id.* at 146, 217-218.) The parties never reduced their agreement to writing. (*Id.* at 206.) This was, in part, because Plaintiff trusted Weinstein as a fellow member of the Orthodox Jewish community where "successful business relationships are founded upon trust and confidence." (Am. Compl. ¶ 23.)

On December 19, 2006, in reliance on Weinstein's promises, Berger transferred $9.5 million to the bank account of Pine Projects, a company controlled by Defendant Weinstein, to be used at the closing on 2040 Market Street. (Sept. 10, 2007 Tr. at 146; Ex. JFK-1 (Pine Projects Dec. Bank

---

[2] The five parcels of property that make up the JFK properties include: (1) 2001 John F. Kennedy Boulevard; (2) 2101 John F. Kennedy Boulevard; (3) 2201 John F. Kennedy Boulevard; (4) 2301 John F. Kennedy Boulevard; and (5) 60 North 23rd Street.

Statement) at 6.)  Later that week, Plaintiff wired $12 million to Defendant Montgomery Abstract, the title company associated with the closing on the JFK properties.  (Sept. 10, 2007 Tr. at 146; Ex. W-15 (JFK Documentation).)

Soon after the $21.5 million was remitted, Weinstein informed Plaintiff that additional funds were required in furtherance of their investments.  With regard to 2040 Market Street, Weinstein explained that he had found a purchaser for the air rights over the property.  (*Id.* at 147.)  Before that sale could go forward, however, the mortgage would have to be satisfied, which would require an additional $23 million. (*Id.* at 147-149; Sept 11, 2007 Tr. at 147-49.)  Regarding the JFK properties, Weinstein claimed that the bank which provided the financing for the purchase required two years interest up-front, amounting to $7 million, and therefore the parties needed more money for closing. (Sept. 10, 2007 Tr. at 147.)  Additionally, the closing costs on the JFK properties were $4 million more than initially anticipated.  (*Id.*)   As a result of these representations, Plaintiff wired an additional $15 million to Pine Projects' bank account – $10 million on January 8, 2007 and $5 million on January 19, 2007.  (Ex. JFK-1 (Pine Projects Jan. Bank Statement) at 3, 8.)

**B.    Defendant Weinstein's Allocation of Plaintiff's Funds**

*i.    Overview*

Despite the aforementioned representations, Plaintiff's money was not invested as Defendant Weinstein promised him it would be.  Although the parties dispute a number of issues concerning how Berger's funds were spent, a few material facts are clear.

Aside from the $12 million wired directly to Defendant Montgomery Abstract, used toward the purchase of the JFK properties, Plaintiff's funds were not invested directly in the two properties. Instead, without Plaintiff's knowledge, Weinstein commingled Plaintiff's money with Pine Projects'

4

money, used the inflow of cash to satisfy negative bank account balances, and spent Plaintiff's funds on various expenditures other than the two properties at issue.  Weinstein later "credited" Plaintiff with money he laid out toward the purchase of the properties.  The amounts "credited" are in dispute.

Further, even the money Weinstein "credited" to Plaintiff, or claims to have invested on behalf of Plaintiff, was not invested in accordance with the parties' agreement.  In addition to 2040 Market Street and the JFK properties, Weinstein invested Plaintiff's money in 900 Delaware Avenue, in Philadelphia, Pennsylvania and 101 West Avenue in Jenkintown, Pennsylvania.  Plaintiff was unaware that his money was invested in these properties until after the commencement of this litigation.

ii. <em>2040 Market Street</em>

In December 2006, while Plaintiff and Defendant Weinstein were entering into an investment relationship, 2040 Market Street was owned by 2040 Market Associates, LP ("2040 Market Associates").  (Oct. 1, 2007 Tr. at 22.)  2040 Market Associates is an entity controlled in part by Defendant Chawla, who Plaintiff had met at the December meeting regarding the JFK properties. (*Id.*)  Contrary to Plaintiff's belief, Defendant Chawla and Weinstein were not business associates, but rather, Chawla represented the sellers and Weinstein the buyers of 2040 Market Street. (*Id.* at 25.)  On October 4, 2006, Defendant Weinstein entered into a purchase agreement with 2040 Market Associates for 2040 Market Street.  (*Id.*; Ex C-11 (2040 Purchase Agreement).)  The purchase price on that property was $11 million, plus assumption of the existing mortgage.  (Oct. 1, 2007 Tr. At 25-26; Ex. C-11.)

By the closing date in early January, the money Plaintiff sent Weinstein for the purpose of closing on 2040 Market Street was long gone.  Pine Projects' December bank statement reflects a

5

$9,499,975 wire from Plaintiff on December 19, 2006. (Ex. JFK-1 (Pine Projects Dec. Bank Statement) at 6.) At the time of the wire, the Pine Projects' account was a negative balance of $2,503,183.28. (Ex. JFK-1 at 6.) Accordingly, over $2.5 million of Plaintiff's money was used to immediately satisfy this debt without Plaintiff's knowledge. (*Id.*) By December 21, 2006, the Pine Projects' bank account was again in a negative position. (*Id.* at 7.) Because none of the money expended on the purchase of 2040 Market Street was transferred during the period between December 19 and December 21, 2006, Defendant Weinstein had spent all of Plaintiff's $9.5 million without investing any of it in 2040 Market or any other real estate project involved in this litigation. (*See* Exs. W-14 – W-19 (Weinstein Financial Statements); Sept. 11, 2007 Tr. at 270-272.)

Defendant Weinstein had, however, laid out $1.75 million to Defendant World Acquisition Partners, a company owned and controlled by Defendant Chawla, for the purchase of 2040 Market Street by the date of closing. (Ex. C-12 (World Acquisition Partners Financial Statement).) Weinstein asserts that he paid these funds "on behalf of" Plaintiff, although there is no evidence that Defendant Chawla knew that Weinstein was investing money on behalf of Plaintiff. Weinstein promised to provide Chawla with the outstanding balance in the near future. However, when Weinstein failed to adequately fund the closing by April 2007, 2040 Market Associates declared him in default.[3] (Oct. 1, 2007 Tr. at 26.)

---

[3] There are discrepancies between Weinstein's "records," which were not kept contemporaneously but rather prepared for the purpose of this litigation, and Chawla's records, which were prepared contemporaneously and certified by a public accountant. Defendant Weinstein's records are, at best, incomplete. For example, Weinstein alleges that he paid World Acquisition Partners $130,000 on February 23, 2007, toward the purchase of 2040 Market Street on Plaintiff's behalf. Defendant Chawla's records show that a wire was received on this same day, but was used toward the purchase of a fifth property, 11501 Roosevelt Boulevard. Weinstein states that he purchased 11501 Roosevelt Boulevard for another investor, unrelated to this litigation.

Thereafter, with the authorization of Weinstein's attorneys, subsequent funds paid by Weinstein to Chawla were applied to the purchase of an entirely different property – 101 West Avenue in Jenkintown, Pennsylvania – rather than to the purchase of 2040 Market Street.  (Oct. 1, 2007 Tr. at 29;  Ex. C-14 (Mar. 30, 2007 email).)  On March 26, 2007, just prior to being declared in default on 2040 Market Street, Weinstein had entered into an agreement with Defendant World Acquisition Partners to purchase its interests in 101 West Avenue.  (*See* Ex. C-13.)  Weinstein submitted $5,117,000 to World Acquisition Partners toward the purchase of the Jenkintown property.[4]  (Ex. C-12.)  Weinstein claims to have invested that money on Plaintiff's behalf; Plaintiff, however, was unaware of the existence of that property until after the commencement of this lawsuit.

### iii.    The JFK Properties

The structure of the purchase of the JFK Properties is labyrinthine.  For the purpose of the preliminary injunction, only an outline is necessary.  On December 21, 2006, Defendant JFK BLVD Acquisition Partners, LP ("JFK Acquisition Partners"), an entity controlled in part by Defendant Chawla, acquired the JFK Properties from non-party R&F Penn Center Associates.  (Oct. 1, 2007 Tr. At 12; Ex. C-3 (Settlement Statement JFK Properties).)

Prior to closing, JFK Acquisition Partners contracted to transfer the JFK properties to Defendant Weinstein .  On December 19, 2006, the two parties entered into a Nominee Agreement. (Ex. C-5 (December 19, 2006 Nominee Agreement.)  Pursuant to that agreement, although JFK

---

Weinstein's records are replete with these types of inaccuracies.  These inconsistencies, coupled with gaps in Defendant Weinstein's credibility, lead the Court to distrust Weinstein's statements and records.

[4] Defendant Weinstein states that he never consented to the application of the money he gave to World Acquisition Partners toward the purchase of the Jenkintown property.  The Court discredits this testimony.

Acquisition Partners purchased the JFK properties from R&F Penn Center Associates, they did so "solely as the agent and nominee of Defendant Weinstein." (*Id.* ¶ 2.) Furthermore, JFK Acquisition Partners promised to obtain financing for the purchase of the property. (*Id.*) Weinstein was responsible for giving JFK Acquisition Partners $12 million, to be used at the closing, and for covering the closing costs.

The total transaction price associated with the nominee agreement was $70 million. (*Id.*; Oct. 1, 2007 Tr. at 12.) Weinstein had up to two years to complete the purchase of the properties or to assume full responsibility for any outstanding mortgages; upon completion of one of these two prerequisites, full legal ownership would be transferred to Weinstein from JFK Acquisition Partners. (Ex. C-5 ¶ 2; Oct. 1, 2007 Tr. at 12.)

Unlike 2040 Market Street, Plaintiff's funds can be traced directly to the closing on the JFK properties. As noted above, on December 20, 2006 Plaintiff had $12 million wired to Defendant Montgomery Abstract, the title company associated with the closing; that money was turned directly over to R&F Penn Center Associates at the closing.[5] (Ex. C-12.) Nonetheless, these funds were insufficient to cover the closing costs, for which Defendant Weinstein was responsible. JFK Acquisition Partners covered $2.85 million in closing costs. (Oct. 1, 2007 Tr. at 15-16.) In June 2007, Weinstein still had not repaid JFK Acquisition Partners for the closing costs and JFK BLVD

_____

[5] Weinstein alleges that he has further expended $432,955.35 on "expenses" relating to the JFK properties, which he made on behalf of Plaintiff. (Ex. W-14 ("JFK Expenses Documentation").) As was the case with 2040 Market Street, even if Defendant actually spent these sums, he did not use Plaintiff's funds. These alleged expenses were paid out in March and April of 2007. (Ex. W-14.) As noted above, the $9.5 million Plaintiff wired to Pine Projects in December was expended by December 21, 2006. Similarly, the additional $15 million Plaintiff wired to Pine Projects in January 2007 was spent by January 22, 2007 when Pine Project's bank account was running negative balances once again. (*See* Ex. W-14 ("JFK Expenses – Documentation"); Ex. JFK-1 (Pine Projects Jan. 2007 Statement) at 3, 8, 9.)

Acquisition Partners declared Weinstein in default of the Nominee Agreement.  (*Id.*)

iii.      *Air Rights on 2040 Market Street*

According to Defendant Weinstein, around January 2007, he received an offer to purchase 500,000 square feet of buildable air rights above 2040 Market Street.  Before he could sell those rights, however, he had to pay off the financing on 2040 Market Street.  (Sept. 11, 2007 Tr. at 148-49.)  This was problematic, however, because the mortgage on 2040 Market Street had a lock-out provision, which stated that a penalty would be assessed for pre-payment of the loan.  (*Id.*)

To solve this problem, Weinstein proposed moving the security on the loan from 2040 Market Street to the JFK properties and repaying the financing on the JFK properties.  (*Id.* at 150.)  According to Weinstein, his plan would require an additional $23 million.  (*Id.* at 154.)  For the purpose of fund raising, Weinstein visited Berger in London.  (*Id.* at 156.)  As a result of this meeting and various other requests made by Weinstein, including discussed above, Berger remitted an additional $15 million in January 2007.

When Weinstein could not collect all $23 million to satisfy the debt on the JFK properties, he tried to strike an agreement with Defendant Chawla – in return for allowing Weinstein to move security on the 2040 Market Street mortgage to the JFK properties, Weinstein would give JFK BLVD Acquisition Partners cash, along with his interests in 900 Delaware Avenue in Philadelphia. Chawla said that he would accept the deal, so long as Weinstein first "cleaned up the equity partnership."  (*Id.* at 159.)  Therefore, according to Weinstein, he spent $10,005,177.04 "cleaning up the equity" in 900 Delaware Avenue.  (Ex. W-19A; Sept. 11, 2007 Tr. at 180.)  He claims to have invested this money into 900 Delaware Avenue on behalf of Plaintiff; again, Plaintiff was not made aware of these investments until after the commencement of this litigation.  (Sept. 11, 2007 Tr. at

9

160-61; Ex. W-19A ("900 Delaware – Documentation").)

Chawla later informed Weinstein that his partner, Richard Zeghibe, would not accept interest in 900 Delaware Avenue as payment for the financing on the JFK properties. (Sept. 11, 2007 Tr. at 160.) Therefore, Plaintiff's funds remain invested in 900 Delaware Avenue.

Defendant Weinstein paid out $2 million for the closing on 900 Delaware Avenue shortly after Plaintiff wired $10 million to Pine Projects on January 8, 2007. (Ex. JFK-1.) These funds, therefore, may be directly attributed to Plaintiff. The remaining $8 million of Plaintiff's money, however, cannot be directly attributed to the funds Plaintiff wired to Pine Projects. (*Id.*)

### C. Termination of the Parties' Business Relationship

On February 6, 2007, Weinstein, through counsel, wrote to Plaintiff indicating that he intended to terminate their business relationship: "[T]his letter serves as formal notice to sever and terminate any and all business relationships between Mr. Weinstein and Mr. Berger." (Pl.'s Ex. 17 (Termination Letter).) The letter continued, "[i]n furtherance of the above, please provide me with wire instructions so that Mr. Weinstein may wire to Mr. Berger whatever funds Mr. Berger provided to Mr. Weinstein." (*Id.*) Plaintiff agreed to sever the relationship and complied with the request for wiring instructions so that Weinstein might return his $ 36.5 million. (Pl.'s Ex. 18 (Reply to Termination Letter).) Despite further negotiations after these letters, the parties were unable to resolve their differences. In spite of Plaintiff's repeated demands, Weinstein never returned Plaintiff's money.

Notwithstanding the fact that *Defendant's* attorney declared the relationship terminated, Defendant continued to invest money on behalf of Plaintiff in all of the properties involved in this action – 2040 Market Street, the JFK properties, 900 Delaware Avenue and 101 West Avenue.

10

### D.   Procedural History

Plaintiff commenced this action on March 13, 2007.  His Amended Complaint raises allegations of fraud, conversion, civil conspiracy, promissory estoppel, fraudulent transfer, unjust enrichment, and declaratory judgment. These claims have been lodged against multiple defendants, in addition to Defendant Weinstein and his company, Pine Projects.  Also named as Defendants are: (1) Ravinder Chawla and his company, World Acquisition Partners; (2) JFK BLVD Acquisition Partners and 2040 Market Associates, the entities that own the JFK properties and 2040 Market Street; (3) Mark Sahaya, a broker who assisted in the real estate transactions; (4) Montgomery Abstract, the title company who received Plaintiff's $12 million wire in furtherance of the acquisition of the JFK properties; and (5) UBS Real Estate Securities, Inc., the company that refinanced the JFK properties in 2007.

In late July 2007, while this case was before Judge Ludwig, Plaintiff filed a motion for a preliminary injunction.  Following reassignment, on September 10, September 11, and October 1, 2007, the Court held three days of evidentiary hearings.[6]  At the close of the third day of hearings, the Court issued a preliminary injunction which: (1) enjoined the sale of 900 Delaware Avenue and 101 West Avenue; (2) required court approval prior to the sale of 2040 Market Street and the JFK properties; and (3) required Defendant Weinstein to submit a list of his assets and liabilities to all of the parties.  Furthermore, the Court allowed Plaintiff additional discovery as to Defendant Weinstein's assets.  The purpose of the additional discovery was to give Plaintiff the opportunity to

---

[6] After the September 11, 2007 hearing, Defendant Weinstein filed an appeal of this Court's denial of his motion to stay proceedings and compel arbitration before a Jewish tribunal, known as a Beth Din.  The Third Circuit initially granted a temporary stay, but ultimately denied Defendant Weinstein's emergency motion for a stay on September 25, 2007.  Subsequent to the Third Circuit's denial, this Court reconvened its evidentiary hearing.

trace exactly how Defendant Weinstein spent his money, rather than relying on Weinstein's assurances that he "credited" Plaintiff with certain investments.

After the close of this additional discovery period, Plaintiff filed a motion to broaden the preliminary injunction to include all of Defendant Weinstein's real estate assets, and for the appointment of a receiver as to Defendant Weinstein's assets unrelated to real estate.   On January 3, 2008, this Court entered an Order requiring Defendant Weinstein to show cause why the Preliminary Injunction Order should not be broadened and why a temporary receiver should not be appointed.  A show cause hearing was held on January 17, 2008.

II.     **CONCLUSIONS OF LAW**

A.     **Standard of Review for a Preliminary Injunction**

A preliminary injunction shall not issue except under certain limited circumstances, whereby the party seeking the injunction has shown: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 524 (3d Cir. 2004) (*quoting KOS Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)).  "The grant or denial of a preliminary injunction is committed to the sound discretion of the district judge, who must balance all of these factors in making a decision."  *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982).  Nonetheless, the issuance of a preliminary injunction is "an extraordinary remedy," which should be reserved for "limited circumstances."  *KOS Pharms.*, 369 F.3d at 708 (*quoting Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-27 (3d Cir.

1994)).  The burden of proving all four elements for a preliminary injunction lies squarely with the plaintiff.  *P.C. Yonkers, Inc. v. Celebrations The Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) (citations omitted).

An injunction may be necessary to "'ensure the satisfaction of a potential future judgment ordering the transfer of money from defendant[s] to plaintiffs.'" *Gerardi v. Pelullo*, 16 F.3d 1363, 1373-74 (3d Cir. 1994) (*quoting Hoaxworth v. Blinder Robinson & Co.*, 903 F.2d 186, 196 (3d Cir. 1990)).  Thus, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of United States Virgin Islands*, 357 F.3d 297, 301 (3d Cir. 2003) (*citing Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).  Where issues of fact are in dispute among the parties regarding a motion for preliminary injunction, the district court must hold an evidentiary hearing. *Elliot v. Kieswetter* 98 F.3d 47, 53 (3d Cir. 1996).[7]  Finally, a preliminary injunction may be granted on procedures far less formal than those required in a trial on the merits, which may include consideration of affidavits and hearsay evidence.  *Startrak Systems, LLC v. Hester*, Civ. A. No. 07-

---

[7] Defendant Weinstein argues that a preliminary injunction may not issue where facts are in dispute.  *See Sypniewiski v. Warren Hills Regional Board of Education,* 307 F.3d 243, 276 (3d Cir 2002) (Rosenn, J. dissenting) ("[A]s a requisite to the issuance of an interlocutory injunction . . . [t]here must be no disputed issues of fact.") (*citing Charles Simkin & Sons, Inc. v. Massiah*, 289 F.2d 26, 29 (3d Cir. 1961)).  While there is some support for Defendant's position, a more persuasive and substantial body of authority indicates that this Court may issue a preliminary injunction, even in the face of disputed facts, so long as an evidentiary hearing is conducted to determine the veracity and credibility of the evidence submitted by the parties.  *Elliot,* 98 F.3d at 53 ("A district court cannot issue a preliminary injunction that depends upon the resolution of disputed issues of fact *unless the court first holds an evidentiary hearing.*") (emphasis added); *see also Kos Pharm., Inc. v. Andryx Corp.*, 369 F.3d 700, 719 n.16 (3d Cir. 2004) ("[W]here the motion turns on a disputed factual issue, an evidentiary hearing is ordinarily required."); *Professional Plan Examiners of NJ, Inc. v. Lefante*, 750 F.2d 282, 288 (3d Cir. 1984).

As the parties are painstakingly aware, this Court conducted three days of evidentiary hearings and, accordingly, it is within this Court's judicial power to resolve disputes of fact.

3207, 2007 WL 2705159, at *8 (D.N.J. Sept. 14, 2007) (*citing Kos Pharms., Inc.*, 369 F.3d at 718-719).

**B.      Elements of a Preliminary Injunction**

*1.      Likelihood of Success on the Merits*

As discussed below, Plaintiff has shown a reasonable likelihood of success as to his claims of fraud and unjust enrichment against Defendant Weinstein.  Because a likelihood of success as to these two claims is sufficient to support the entry of a preliminary injunction, the Court need not address Plaintiff's claims for conversion, civil conspiracy, promissory estoppel, fraudulent transfer, or declaratory judgment.

*a.      Fraud*

"To establish a claim for fraudulent misrepresentation under Pennsylvania law, a Plaintiff must prove: '(1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage to the recipient as the proximate cause.'"[8]  *Petruska v. Gannon Univ.*, 462 F.3d 294, 310 (3d Cir. 2006) (*citing Martin v. Lancaster Battery Co.*, 606 A.2d 444, 448 (Pa. 1992)).  Under Pennsylvania law, a claim of fraud must be proven by clear and convincing evidence.  *Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991).

Plaintiff has shown a likelihood of success on the merits of his fraudulent misrepresentation claim against Defendant Weinstein.  Weinstein clearly represented to Plaintiff that his funds would be used for the purchase of and to fund expenses related to two properties – 2040 Market Street and the JFK Properties.  Relying on that representation, Plaintiff ultimately agreed to give Weinstein

---

[8] The parties and this Court agree that Pennsylvania law applies to this diversity action.

$36.5 million.  While $12 million of Plaintiff's funds were actually used in the purchase of the JFK properties, the only funds which did not first pass through Weinstein's hands because they went directly to a title company, none of Plaintiff's other funds actually went to the purchase of either property.  Plaintiff's funds were commingled with those of Pine Projects and then used to satisfy other obligations and debts of Defendant Weinstein.

Furthermore, Weinstein claims to have invested over $15 million on behalf of Plaintiff in properties that were not part of their original agreement, namely 900 Delaware Avenue and 101 West Avenue.  Weinstein did so without ever telling Defendant about these investments.  Plaintiff had to commence a lawsuit to get information about how his money had been invested.  This could be in part because of the troubling fact that Weinstein did not keep contemporaneous records of how he was investing Plaintiff's money.  Defendant has shown a lackadaisical attitude with Plaintiff's funds which shocks the conscience.  These are just a few examples of the many ways in which Defendant Weinstein fraudulently induced Plaintiff to invest money with him, and then recklessly squandered Plaintiff's funds.

Finally, Plaintiff has been damaged by Defendant Weinstein's actions.  Because Defendant failed to invest Plaintiff's funds as promised at the respective closings, the owners of both 2040 Market Street and the JFK properties have declared Weinstein, and accordingly his silent partner Plaintiff, in default.  Moreover, Plaintiff's investment is currently tied up in two properties, about which Plaintiff knows nothing.  Finally, even if this Court were to credit Defendant's testimony in full, he still cannot account for over $1 million of Plaintiff's money.  Nor can Defendant account for the $9.125 million, or twenty percent of the total investment funds, that he represented to Plaintiff he would invest in their joint venture.  Accordingly, Plaintiff has shown a likelihood of success on

his fraud claims.  *See Allstate Ins. Co. v. Davidson Medical Grp.*, Civ. A. No. 01-5938, 2004 WL

2357797 (E.D. Pa 2004) (granting preliminary injunction where Defendant fraudulently induced

payment from Plaintiff); *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508 (D.N.J. 1999)

(granting preliminary injunction based on claim of fraud).

*b.*     *Unjust Enrichment*

Plaintiff has also shown a likelihood of success on the merits as to an unjust enrichment

claim against Defendant Weinstein.  In Pennsylvania, the elements of a claim for unjust enrichment

are: "(1) benefits conferred on one party by another; (2) appreciation of such benefits by the

recipient; and (3) acceptance and retention of these benefits in such circumstances that it would be

inequitable for the recipient to retain the benefits without payment of value." *Lauren W. ex rel. Jean

W. v. Deflaminis*, 480 F.3d 259, 277 (3d Cir. 2007).  "[T]he doctrine of . . . unjust enrichment[] is

inapplicable where a written or express contract exists." *Northeast Fence & Ironworks v. Murphy

Quigley*, 933 A.2d 664, 669 (Pa. Super. 2003) (internal citations omitted).

It is clear, after the evidentiary hearings, that no enforceable contract existed between these

parties.  "To be enforceable a contract must be complete.  That is to say, it must represent a meeting

of the parties' minds on the essential terms of their agreement." *Ruthrauff, Inc. v. Ravin, Inc.*, 914

A.2d 880, 888 (Pa. Super. 2006).  To say these parties did not have a "meeting of the minds" as to

the essential terms of their agreement would be an understatement.  Plaintiff states that the parties

agreed that he would invest $36.5 million; Defendant states that the agreed amount was $48 million.

(Sept. 10, 2007 Tr. at 48); *see also Northeast Fence & Ironworks,* 933 A.2d at 669 (dispute over

price term supported judicial finding that no contract existed).  Plaintiff believed that the money

would be used entirely and directly in the purchase of two properties – 2040 Market Street and the

16

JFK properties; Defendant apparently believed that Plaintiff was "investing in Pine Projects" and not in any individual properties. (*See* Sept. 11, 2007 Tr. at 226 ("Weinstein: He asked me . . . at my discretion to do what I felt was correct to purchase these properties."); Sept. 10, 2007 Tr. at 42.) Defendant Weinstein states that he told Plaintiff that the two would split any profits received fifty-fifty; Plaintiff had no such recollection. (Sept. 10, 2007 Tr. at 218-219; Sept. 11, 2007 Tr. at 143.) It appears that the parties did not have a "meeting of the minds" as to *any* of the essential terms of their agreement. Accordingly, there is no enforceable contract between Plaintiff and Defendant Weinstein and Plaintiff may recover under a theory of unjust enrichment.

Defendant Weinstein has been unjustly enriched by Plaintiff's funds. Simply put, Weinstein took Plaintiff's money and applied it to his own debts, only later crediting Plaintiff with expenditures on various properties. For example, on more than one occassion, Defendant applied Plaintiff's money to satisfy a negative balance in the Pine Project's bank account. Furthermore, with regard to 900 Delaware Avenue and 101 West Avenue, if Weinstein had not invested Plaintiff's money toward these purchases, Weinstein would have lost those properties altogether. (*See* Oct. 1, 2007 Tr. at 29.) Additionally, as Defendant admitted at his hearing, he took all of Plaintiff's money without ever fulfilling his promise to contribute an additional twenty percent toward the purchase of properties. Finally, as noted above, Defendant still cannot attribute for over $1 million of Plaintiff's funds. These are just a few ways in which Plaintiff has been unjustly enriched by taking Plaintiff's funds and using them at his whim.

In light of the apparent dishonesty and deceit with which Defendant conducted himself – from his initial interactions with Plaintiff through the time of the hearings – it was and continues to be unjust for Defendant Weinstein to profit from Plaintiff's investments. These facts show a

17

likelihood of success on the merits on Plaintiff's unjust enrichment claim.

> ### 2.    *Irreparable Harm*

Likewise, Plaintiff has shown that he will suffer irreparable harm if an injunction does not issue, satisfying the second requirement for interlocutory injunctive relief.  In his application for a preliminary injunction, a plaintiff must make a clear showing of immediate irreparable injury. *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 205 (3d Cir. 1990).  In other words, a plaintiff must show that, absent interlocutory injunctive relief, he will suffer a harm which cannot be redressed following a trial on the merits.  Moreover, "unsatisfiability of a money judgment can constitute irreparable injury" for the purposes of the preliminary injunction analysis.  *Id.* at 206, 194-97; *see also Gerardi v. Pellulo*, 16 F.3d 1363, 1373-74 (3d Cir. 1994); *Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*, 513 F. Supp. 2d 304, 319 (E.D. Pa. 2007); *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 531 (D.N.J. 1999).  However, in order for this to be true, Plaintiff must also seek equitable relief with respect to those assets.  *See United States v. Oncology Assocs., P.C.*, 198 F.3d 489, 496-97 (4th Cir. 1999) ("[W]hen the plaintiff . . . asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* . . . .")

This Court has grave concerns about Defendant Weinstein's ability to satisfy a money judgment against him.  As an initial matter, Defendant Pine Projects's bank account routinely runs substantial negative balances into the millions of dollars, and Weinstein has written several checks on accounts with insufficient funds.  (*See, e.g.,* Ex. JFK-1; Oct. 1, 2007 Tr. at 62, 85.)  Moreover, Defendant Weinstein has shown a penchant for commingling his investor's assets with his own without documentation, and has engaged in serious past financial manipulations.  *See Marsellis-*

*Warner Corp.,* 51 F. Supp. 2d at 531 ("Defendants who have engaged in 'past financial manipulations' create a 'substantial and real risk . . . that funds [will] be unavailable to satisfy a reasonably foreseeable judgment in plaintiff's favor.'") (*quoting Andrews v. Holloway*, Civ. A. No. 95-1047, 1995 WL 875883, at *4 (D.N.J. Nov. 9, 1995)). On this point, there was persuasive evidence submitted by Plaintiff that in late January 2007, Defendant Weinstein told Plaintiff that he laid out over $50 million toward their investments, and he needed additional funds from Plaintiff. (Sept. 10, 2007 Tr. at 155-172; Pl.'s Exs. 7-15; *see also* Ex. W-20 (Feb. 5, 2007 email).) In support of this assertion, he provided checks to Plaintiff, demonstrating his outlays. (Pl.'s Exs. 7-15.) However, none of the checks that Defendant Weinstein presented to Plaintiff had ever been negotiated and, in fact, Defendant Weinstein had not paid out those funds as stated. (Sept. 10, 2007 Tr. at 155-172)

Furthermore, the Court notes that Plaintiff has an equitable interest in the assets frozen by the preliminary injunction and seeks equitable relief in the form of a constructive trust as a remedy for their equitable claims, including their claim for unjust enrichment. *See Oncology Assocs.,* 198 F.3d at 496-97 ("[The] nexus between the assets sought to be frozen through an interim order and the ultimate requested is essential to the authority of a district court in equity to enter a preliminary injunction freezing assets."); *see also Allstate Ins. Co.*, 2004 WL 2357797, at *2 (unjust enrichment is a cognizable equitable claim). Sale of any of the properties where Plaintiff's money has been invested would obviously frustrate any equitable remedy Plaintiff could ultimately receive. *See Republic of Phillipines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986) (court entered a preliminary

injunction prohibited encumbrance of property where plaintiff's sought a constructive trust).[9]

Therefore, in order to ensure Defendant's ability to either satisfy a money judgment or to facilitate the creation of a constructive trust, the Court has enjoined Defendant from selling any interests in 900 Delaware Avenue or 101 West Avenue, the properties in which Plaintiff now finds himself inadvertently invested.  Moreover, court approval is required prior to the sale or encumbrance of 2040 Market Street or the JFK properties.  Such a remedy is properly tailored to preserve the status quo and protect the Plaintiff, given the current record, without being overbroad or punitive.  *See Gerardi*, 16 F.3d at 1373-74 (preliminary injunction was appropriate where it was "reasonably necessary to preserve the status quo, and thus ensure the satisfaction of a potential future judgment ordering the transfer of money from defendant[s] to plaintiffs.") (internal quotations omitted).

       3.      *Harm to the Defendant and Public Interest*

Finally, as indicated in the prior Order, the Court has considered the relative hardships of the parties, as well as the public interest involved, and concluded that both mandate a limited injunction

---

[9] Defendant Weinstein argues that this Court cannot issue a preliminary injunction in light of *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), where the Supreme Court held that a federal court may not issue an injunction freezing assets in an action for damages, where no equitable interest was claimed by a plaintiff.  The Court's ruling in *Grupo Mexicano* was carefully circumscribed to limit the general equitable powers of federal courts in actions solely at law.  *See id.* ("This case presents the question whether, *in an action for money damages*, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which *no lien or equitable interest is claimed*.") (emphasis added).  Plaintiff here has sought to invoke both the legal and equitable powers of this Court.  *See Oncology Associates,* 198 F.3d at 498-99 (court may issue a preliminary injunction freezing assets where Plaintiff claims both legal and equitable relief.)  Further, by Defendant Weinstein's own admission, Plaintiff's money is invested in all of the properties encumbered by the Preliminary Injunction and, accordingly, Plaintiff holds an equitable interest in those properties.  As such, *Grupo Mexicano* is not controlling.

in Plaintiff's favor.  In issuing a preliminary injunction, a court should consider the harm that a preliminary injunction might cause to a defendant.  "In considering this harm, the district court must undertake to balance the hardships to the respective parties."  *Pappan Enterprises, Inc. v. Hardees Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998).  If the harm to the defendant caused by issuing an injunction is greater than the harm that would befall the plaintiff if no injunction issued, then the court must deny the plaintiff's motion. *Id.*

The injunction in this case is narrowly tailored to limit any harm that might fall upon Defendant Weinstein; it concerns only the very assets under investigation in this action and addresses only the properties that Defendant credited to Plaintiff without his prior knowledge or consent. Further, whereas Plaintiff faces dissipation of any potential future judgment, Defendant is merely asked to preserve the status quo.  There is no evidence in the record that such an imposition would create a substantial hardship for Defendant.

Finally, although not dispositive, the public interest would not be harmed by the issuance of this injunction.  "To the contrary, 'the prevention of unjust enrichment by means of fraud or misappropriation, even that affecting only private entities, is in the general public interest.'" *Allstate Ins. Co. v. Davidson Med. Grp.*, Civ. A. No. 01-5938, 2004 WL 2357797, at *4 (E.D. Pa. Oct. 18, 2004) (*quoting F.T. Int'l v. Mason*, Civ. A. No. 00-5004, 2000 WL 1514881, at *1 (E.D. Pa. Oct. 11, 2000).  Finally, preventing Defendant Weinstein from transferring any of his interests, funded at least in large part by Plaintiff's money, may prevent an unknowing third party from acquiring an interest in the pending lawsuit. *See generally American Telegraph & Telephone Co. v. Winback & Conserve Prog., Inc.*, 42 F.3d 1421,  1427 n.8 (3d Cir. 1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will

be the case that the public interest will favor the Plaintiff.")

### C.    Plaintiff's Motion to Broaden the Preliminary Injunction as to All of Defendant Weinstein's Real Estate Assets Fails

Plaintiff asks this Court to broaden the Preliminary Injunction to include all of Defendant Weinstein's real estate assets.  As discussed above, the Preliminary Injunction is properly tailored to adequately protect Plaintiff's interests, without being overbroad or overly intrusive. The market value of the properties currently encumbered by the Preliminary Injunction Order nears $200 million. (*See* Def. Weinstein's Mem. in Opp. to Pl.'s Mot. To Broaden the Scope of the Prelim. Inj. Exs. A (Appraisal of 101 West Ave.), B (Appraisal of JFK Properties), & C (Appraisal of 2040 Market Street); Oct. 1, 2007 Tr. at 157.)  Although these properties are the subjects of mortgages and other notes, there is adequate evidence that encumbering these properties is sufficient to protect Plaintiff.

Furthermore, there is a nexus between the properties encumbered and Plaintiff's funds; encumbering all of Defendant Weinstein's real estate assets without regard to whether Plaintiff's funds were invested in or whether Plaintiff can claim an equitable right to such properties would be unduly burdensome on Defendant. *See Oncology Assocs.,* 189 F.3d at 496 (emphasizing importance of nexus between assets frozen and relief requested); *see also Allstate Ins. Co.*, 2004 WL 2357797, at *2 (same).  In light of the above, the Court sees no need to extend the scope of the preliminary injunction to all of Defendant Weinstein's real estate assets.

Nonetheless, the parties are still enjoined from selling any interests in 900 Delaware Avenue or 101 West Avenue.  Furthermore, court approval is required prior to the sale **or encumbrance** of the JFK properties or 2040 Market Street.  Finally, Defendant Weinstein is required to notify the Court of any asset transfers from the January 17, 2008 through the end of trial or other resolution of

the case.

**D.      Plaintiff's Request for Appointment of a Temporary Receiver Similarly Fails**

It is well settled that the appointment of a receiver is within the inherent equitable powers of a federal court. *Tanzer v. Huffines*, 408 F.2d 42, 43 (3d Cir. 1969). However, "the appointment of a receiver is 'an extraordinary remedy, and ought never be made except in cases of necessity, and upon a clear and satisfactory showing that [an] emergency exists.'" *Walsh v. Kenworth Trucks of Phila.*, Civ. A. No. 81-4636, 1985 WL 2770, at *1 (E.D. Pa. Sept. 26, 1985) (citing *Rumbaugh v. Beck*, 491 F. Supp. 511, 520 (E.D. Pa. 1980). Furthermore, a receiver must be absolutely necessary "'to protect the interests of the plaintiff in the property involved.'" *Id.*; *see generally Stainton v. Tarantino*, 637 F. Supp. 1051, 1072 (E.D. Pa. 1989) ("[A] court should exercise its power to appoint a receiver sparingly, with caution and circumspection, and only in an extreme case under extraordinary circumstances, or under such circumstances as demand or require summary relief.") (internal citations omitted).

As the appointment of a receiver interferes with the defendant's property rights, the party seeking the appointment must show that he has some "legally recognized right [in the property] . . . amounting to more than a mere claim against the [defendant]." *Mintzer v. Arthur L. Wright & Co.*, 263 F.2d 823, 825 (3d Cir. 1959); *see also Walsh,* 1985 WL 2770, at *1 (identification by a plaintiff of a legally-cognizable property interest in a defendant's property is "prerequisite" to appointment of a receiver).

Plaintiff has not adduced sufficient evidence that he has any interest in Defendant's non-real estate assets and, accordingly, has not met the high burden of showing that appointment of a receiver is necessary. As such, Plaintiff's request will be denied.

**III.    CONCLUSION**

In light of the above, the Court will grant in part and deny in part Plaintiff's motion to broaden the preliminary injunction.  The Court will not expand the scope of the injunction to real estate assets owned by Defendant Weinstein which are not related to this action.  Furthermore, the Court will not appoint a receiver to control Defendant Weinstein's non-real estate assets.  Finally, the Court's Preliminary Injunction Order is now finalized.  An appropriate Order follows.

It is worth noting that the Court is concerned about Defendant Weinstein's lack of clarity and evasiveness, which has been observed in Court and which are apparent from the face of his depositions.  The Court admonishes Defendant Weinstein to be forthright and candid as these proceedings continue, and to give full and complete answers from here forward, be they responses to written interrogatories or at deposition.  A failure to respond in that manner will only result in Plaintiff seeking additional remedies, which may include sanctions.

The Court does not have to remind Defendant's counsel of their duty of candor.  Defendant Weinstein should also be made aware of that duty.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BERISH BERGER,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **ELI WEINSTEIN, RAVINDER** | : | |
| **CHAWLA, 2040 MARKET** | : | |
| **ASSOCIATES, LP, JFK BLVD** | : | |
| **ACQUISITION PARTNERS, LP, UBS** | : | |
| **REAL ESTATE SECURITIES, INC.,** | : | |
| **MARK SAHAYA, PINE PROJECTS,** | : | |
| **LLC, MONTGOMERY ABSTRACT,** | : | |
| **WORLD ACQUISITION PARTNERS** | : | |
| **CORP.,** | : | **No. 07-994** |
| **Defendants.** | : | |

## ORDER

**AND NOW**, this **23rd** day of **January**, **2008**, upon consideration of the following motions, responses thereto, and arguments made by the parties at hearings held on September 10, September 11, October 1, 2007 and January 17, 2008, it is hereby **ORDERED** that:

1.  Plaintiff's Motion to Broaden the Scope of the Preliminary Injunction Entered on October 1, 2007 and for Appointment of a Receiver (Document No. 151) is **GRANTED in part** and **DENIED in part**.

2.  The Preliminary Injunction issued by this Court on October 1, 2007 is amended to read:

    a.  The parties are enjoined from selling any interests in 900 Delaware Avenue, in Philadelphia, Pennsylvania, and 101 West Avenue, in Jenkintown, Pennsylvania.

    b.  Defendant 2040 Market Associates, LP and JFK BLVD Acquisition Partners,

LP are to notify the Court of any potential purchasers for either "The JFK Properties" or 2040 Market Street.  The sale or future encumbrance of either "The JFK Properties" or 2040 Market Street are subject to Court approval and a determination of what, if any, funds should be used to reimburse Plaintiff for his investment.

    c.     Defendant Weinstein is under a continuing obligation to notify the Court of any asset transfers from the January 17, 2008 through the end of trial or other resolution of the case.

3.     In all other respects, the October 1, 2007 Order shall remain in unchanged.

**BY THE COURT:**

_____

**Berle M. Schiller, J.**